U.S. DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SPRINGFIELD DIVISION

| | |
|---|---|
| MICHELLE ANDERSON, Individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br> vs.<br><br>FORD MOTOR COMPANY,<br><br>       Defendant. | NO.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMAND |

   Plaintiff Michelle Anderson ("Plaintiff"), individually and on behalf of all others similarly situated, by and through counsel, brings this Class Action Complaint against Ford Motor Company ("Defendants" or "Ford") and upon Plaintiff's own acts and experiences, information and belief and investigation of counsel, states as follows:

## I. JURISDICTION AND VENUE

   1.  This Court has original jurisdiction over this action under 28 U.S.C. section 1332(d) of the Class Action Fairness Act because the aggregated claims of the class members in this matter exceeds the sum or value of $5,000,000 exclusive of interest and costs, because Plaintiff and Defendants are residents of different states, and there are at least one hundred members of the proposed classes.

   2.  Venue is proper in this Court pursuant to 28 U.S.C. section 1391 because Plaintiff suffered injuries as a result of Defendant's acts in this District, a substantial number of the events giving rise to this Complaint occurred in this District, and Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets of this District by conducting business in this District; and (2) are subject to personal jurisdiction in this District.

## II. PARTIES

3.     Michelle Anderson is a resident of Willard, Missouri, located in Greene County.

4.     Ford Motor Company is a Delaware corporation with its principal place of business located at One American Road, Dearborn, Michigan 48121. Ford is in the business of designing, manufacturing, marketing and distributing motor vehicles. Ford's vehicles include those vehicles sold under the brands Ford, Lincoln, and Mercury.

5.     At all times relevant to this action, Ford designed, manufactured, marketed, distributed, and warranted the vehicles at issue in this case in the State of Missouri and throughout the United States.

## III. NATURE OF THE CASE

6.     Historically, automobile sunroofs have been modestly sized, spanning just a small portion of the roof over the driver and front passenger seats.

7.     Starting in the mid-2000s, automobile manufacturers expanded sunroofs in size so that now these sunroofs (i.e., sheet(s) of glass) account for nearly the entire roof of the vehicle.  These expanded sunroofs are often referred to as "panoramic."[1]

8.     While panoramic sunroofs are aesthetically pleasing, and thus command a premium price, they also pose new and significant engineering challenges. Replacing metal roofs and small glass sunroofs with large plates of glass requires precision in the strengthening, attachment, and stabilization of the glass.

9.     Like other manufacturers, Ford has failed to meet these engineering challenges, as is evidenced by its own panoramic sunroofs' propensity to spontaneously shatter (referred to herein as "the Defect"). Unlike several manufacturers that have issued safety recalls, Ford has not recalled its defective panoramic sunroofs.

---

[1] Ford calls the enlarged sunroofs Panoramic Sunroofs, Panoramic Vista Roofs, Dual Panel Moonroofs, or Power Moonroofs depending upon the vehicle model. For consistency, all will be referred to collectively as the Ford "panoramic sunroofs" or "defective sunroofs."

10.     The shattering events are so powerful that startled drivers compare it to the sound of a gunshot, after which glass fragments often rain down upon the occupants of the vehicle, sometimes while driving at highway speeds.

11.     For Ford vehicles, at least 99 owners of vehicles with defective sunroofs have reported to the National Highway Traffic and Safety Administration ("NHTSA") that their sunroofs have spontaneously exploded or shattered. A sampling of these consumer complaints is attached in Exhibit 1 (these consumer complaints were accessed at http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues on June 15, 2017).

12.     Ford knew or should have known about the Defect since at least 2008 when three or more NHTSA complaints were filed regarding the Defect in the Ford Edge. *See* Exhibit 1.

13.     On or before May 12, 2014, Ford knew or should have known about the Defect because NHTSA opened an investigation of Kia Motor Company vehicles whose panoramic sunroofs were exhibiting the same defect (https://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM455160/INOA-EA14002-1938.PDF, accessed on June 15, 2017).  Ford certainly knew about the Defect by the time NHTSA formally included Ford in this investigation on or about July 25, 2014. *See* Exhibit 2 (Letter from Scott Yon, Office of Defects Investigation Chief, to Steven Kenner, Global Director of the Ford Motor Company Automotive Safety Office (July 25, 2014), available at https://static.nhtsa.gov/odi/inv/2014/INIM-EA14002-63587.pdf (accessed on June 15, 2017)).

14.     On April 14, 2016, NHTSA expanded its investigation inquiries as to Ford and other manufacturers regarding the Defect. *See* Exhibit 3 (Nat'l Highway Traffic Safety Admin., *EA12-002: General Order Directed to Motor Vehicle Manufactures* (April 14, 2016), available at http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514031/INLM-EA14002-63477.pdf (accessed on June 15, 2017)). Ford's responses are not yet available on the NHTSA website.  The investigation remains open.

15.     Despite knowing of the Defect, Ford refuses to warn drivers of the danger and continues to sell and lease the vehicles with defective panoramic sunroofs without disclosing the Defect to consumers.

16.     Plaintiffs seek relief for themselves and a class of all other consumers who purchased or leased Ford vehicles with panoramic sunroofs, or in the alternative all Missouri consumers, to redress the harm they suffered as a result of the Defect. Plaintiffs request an award of damages and appropriate equitable relief, including an order enjoining Ford from continuing to sell vehicles with the Defect and requiring Ford to adequately disclose the Defect to current Ford owners and repair their vehicles.

## IV.  SUBSTANTIVE ALLEGATIONS

**A.     The Ford Panoramic Sunroof Defect**

17.     Ford designs, manufactures, markets, and distributes automobiles in the United States under the Ford, Lincoln, and Mercury brand names. The Ford automobile models that are the subject of this complaint (including Electric and Hybrid Models) are: the Ford Edge 2007-present, Ford Flex 2009-2016, Ford Focus 2009-2016, Ford Fusion 2010-present, Ford Explorer 2011-2016, Ford F 150 2011-2016, Ford Mustang 2009-2014, Ford Escape 2008-2016, Ford Transit Connect 2014-2106, Ford C-Max 2013-2016, Lincoln MKX 2007-2016, Lincoln MKS 2009-2015, Lincoln MKZ 2013-2016,  Lincoln MKT 2010-2016, Mercury Milan 2010-2011, and Mercury Montego 2010-2011 with factory-installed panoramic sunroofs (collectively "Class Vehicles"). Plaintiffs anticipate amending the definition of the Class Vehicles when Ford identifies in discovery all of the vehicles it manufactured and sold with the optional panoramic sunroof.

18.     Owners and lessees of Class Vehicles are referred to as "Class Members" or "the Class."

1      19.     Starting in at least the 2007 model year, Ford introduced vehicles with an
2 optional upgrade of a factory-installed panoramic sunroof. The panoramic sunroof designs in
3 all of the Class Vehicles are substantially similar in design and manufacture.

4      20.     Ford generally markets the panoramic sunroofs as a luxury upgrade, available
5 even in its lower-end cars like the Ford Focus or C-Max. The cost to upgrade the sunroof,
6 depending upon the vehicle model, ranges from over one thousand to several thousand dollars.
7 The actual material cost of the panoramic sunroofs is relatively low, making the option one of
8 the most profitable features in the automotive industry.  A sample advertisement for the
9 panoramic sunroof in the 2008 Ford Edge is reproduced below:



21.     The Ford brochure for the 2013 Ford Escape Titanium describes its "Power
panoramic Vista Roof®" as a technological advancement:





Takes tech to new heights.



The all-new Escape offers many of our latest advancements. For entertaining, there's the full-bodied sound of the 10-speaker 390-watt Audio System from Sony®. Push-button start works with the Intelligent Access key fob tucked away in your pocket or purse. Standard MyKey® enables parents of young drivers to block calls and reduce audio volume while driving. Up top, a fabric mesh deflector on the panoramic Vista Roof® helps provide quiet performance along with fresh air.

Audio System from Sony®
Class-exclusive MyKey
110-volt power outlet
Intelligent Access with push-button start
Power panoramic Vista Roof®



2013 ALL-NEW ESCAPE
ford.ca
Go Further

(http://www.auto-brochures.com/makes/Ford/Escape/Ford_US%20Escape_2013.pdf, accessed on June 15, 2017.)

    22.     Panoramic sunroofs are made of tempered or laminated glass that attaches to tracks, which in turn are set within a frame attached to the vehicle. Most panoramic sunroofs, including those offered by Ford, are fit with a retractable sunshade. Examples of panoramic sunroofs appear in the photographs below.

**2012 Lincoln MKX**



**2008 Ford Edge**



**2011 Ford Explorer**



**2013 Ford Escape**



23. Panoramic sunroofs present manufacturing, design, and safety challenges for manufacturers because the large plates of glass take up much of the surface area of the vehicle's roof. The Design and Manufacturing defects described herein with respect to the

Ford panoramic sunroofs outline how the shattering occurs in ways that are unknown and dangerous to the driver and occupants.

24.    One particular challenge is the material make-up of the glass. Whereas some manufacturers, such as Volvo and Honda, have used *laminated* glass, other manufacturers, such as Ford, Nissan, Kia, Hyundai, and Volkswagen, have opted to install panoramic sunroofs with *tempered* glass that feature large areas of ceramic paint.

25.    In the automotive industry, tempered or toughened glass is generally made in the same manner by all manufacturers: a piece of annealed glass is shaped and cut as to original equipment manufacturing ("OEM") standards. The glass is heated and then rapidly cooled, i.e., tempered. The tempering process creates an outer layer of glass that is compressed (similar to being shrink-wrapped) around a middle core of the glass that is constantly pressing outwards, creating tension or tensile force. The compressive and tensile layers create a stronger piece of glass as compared to non-tempered glazing. However, if the compressive layer is compromised, then the entire piece of glass fails catastrophically and often explosively.

26.    Problems with panoramic sunroofs are compounded by the use of thinner glass. Car makers use thinner glass in panoramic sunroofs to save weight and improve vehicle fuel efficiency. Thinner glass, however, is very difficult to temper properly (especially when thicknesses are 4 mm or less) as the compressive layers are thinner, increasing the probability of catastrophic failure.

27.    Additionally, the tempered glass used in the Class Vehicles features a ceramic paint applied prior to tempering. Automotive ceramic paint or ceramic enamels is composed of fine powders of low melting point glass frit, pigments, and other additive oxides, sulfides, or metals. After application of the ceramic enamel, the glass is then tempered, as described above. These ceramic enamels are applied on the top around the edges of panoramic sunroof glazing and serve aesthetic and functional purposes. The ceramic paint area appears as a "black band" along the edge of the glass.

1     28.     Ceramic enamels are known "adulterants" and significantly weaken the

structural strength and integrity of the Class Vehicles' tempered panoramic sunroof glazing.

Among other factors, ceramic enamels compromise glass strength because: (1) the enamels

have different thermal expansion coefficients than the glass substrates (the glass and the paint

expand at different rates), resulting in residual stress between the ceramic enamel and the glass

substrate; and (2) the glass frit will ion exchange with the glass substrate lessening or

eliminating the compressive layer above the tensile region thereby significantly weakening it.

     29.     The ceramic paint area is relatively small in conventional sunroofs, but ceramic

paint areas have become larger with the advent of panoramic sunroofs, resulting in the glass

becoming progressively weaker, more likely to spontaneously burst and, for the unsuspecting

driver and passengers, more dangerous.

     30.     In 2013, the Korea Automobile Testing & Research Institute ("KATRI")

concluded that the enamel used for ceramic paint areas in panoramic sunroofs like those

installed in Ford vehicles impairs the strength of the glass, making it not only less durable than

the usual toughened glass, but also less durable than ordinary glass. For an example of these

findings, see Lee Kwang-bum, et al., *A Study On Toughened Glass Used For Vehicles And Its

Testing Methods,* No. 15-0152 available at https://www-esv.nhtsa.dot.gov/Proceedings/

24/files/24ESV-000152.PDF (accessed on June 15, 2015).

     31.     Following KATRI's report, an Informal Working Group on Panoramic Sunroof

Glazing was established by the United Nations Economic Commission for Europe to evaluate

the safety of panoramic sunroofs. The Working Group is chaired by a representative from

KATRI and is considering whether to amend the UN regulations on safety glazing. At the end

of June 2016, the Working Group confirmed that conventional automotive glass enamels

weaken the mechanical strength of panoramic sunroof glazing. This working group's findings

and regulatory recommendations are available at https://globalautoregs.com/groups/93.

32.     Another challenge presented by the panoramic sunroofs is the need to ensure the sunroof glass is fastened to the vehicle with a sufficient degree of tightness. Ford and other manufacturers fasten the sunroof in a manner that reduces road and wind noise, and makes them less susceptible to rainwater incursion. At the same time, flexing and vibration caused by ordinary driving imposes stress on the sunroof, ultimately causing the glass to shatter. In the Ford models at issue, the compromised tempered glass cannot withstand the pressures and flexing that the sunroof frame and vehicle demand, even when the vehicle is brand new or is parked and sitting still.

**B.     Consumer Complaints Reveal the Magnitude and Seriousness of the Defect**

33.     Below are just a few examples of the numerous complaints regarding Ford sunroofs lodged with NHTSA.  (*See also* Exhibit 1.)  Few, if any, of the drivers who filed reports with the federal government reported that their panoramic sunroof shattered because of an object striking their vehicle. In contrast, many of the drivers report that their panoramic sunroofs spontaneously shattered while the vehicle was in motion.  The complaints are viewable online at https://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues (accessed on June 15, 2017).

> 2008 Ford Edge:  Enclosed are a description and the other information about the Ford Edge you requested. This is part of what was sent to the Ford Motor Company after the sunroof claim was denied on the basis that they feel something from the outside hit the sunroof. On July 24, 2008 at about 8:00 pm, my brother in laws was driving my car on Interstate 75 just north of Bowling Green, Ohio. He was driving 60-65 mph with the windows up, the air conditioner on, and the sunroof closed. As he was driving, he reports a sudden explosion in the car, like he was shot. He and the passenger had small shards of broken glass rain down on them. They managed to safely pull the car to the brim of the highway without any further problems. Upon examining the sunroof, they observed a hole the size of a small dinner plate in the center of the roof and all four corners missing. The glass in the middle and corners of the sunroof had the appearance ?like a volcano? out of the car. Both the driver and the passenger reported that there were no overpasses or cars around them to kick up any object that could

have hit the roof. The glass from the hole was not in the car. I feel this claim has been denied unjustly and that the Ford Motor Company and Planet Ford of Centerville are closing their eyes to an issue that should be investigated thoroughly by someone in person instead of sending ?digital pictures? to someone at corporate to make a decision. After all, this is a safety issue that could have been fatal, leaving Ford with a much bigger problem than just replacing a faulty sunroof. Sincerely, 2008 Ford Edge Limited*TR.

(NHTSA ID: 10237272 – Date Complaint Filed 08/06/2008)

2013 Ford Edge. The panoramic sunroof exploded and shattered. This was not due to any impact or collision of any type, to include debris, flying pebbles, etc. The sunroof exploded outwards, with the glass pushed upwads. Additionally, the glass was shattered in all four corners. This is a design defect, with documented recalls against many makes/models. This exact situation has happened to hundreds of other people/vehicles whether driving at highway speeds or parked. In every case, the scenario appears to be the same: the tempered glass exploded due to design failures while operating the vehicle under normal/routine conditions. Recall requested.

(NHTSA ID: 10863812 – Date Complaint Filed 05/08/2016)

2014 Ford Flex. My wife and I were driving on a 2-lane highway in our vehicle at the approximate speed of 55 mph. Our Ford Flex was equipped with a factory sunroof, which was in the closed position, and the sunshade was open. As we were traveling down this road, with no traffic coming in the opposite direction, or in front of us, we heard a shotgun sound come from above our heads and glass flew everywhere in our vehicle, including the back where our 5-year old daughter was sitting. Our sunroof literally exploded!!!! We closed the sunshade and immediately traveled to our local dealer where we purchased the vehicle. My think at first was that something his the glass, but yet nothing was around us that could have thrown anything onto the glass to break it. When we arrived at the dealership, we exited the car and when I looked at the huge hole in the sunroof, all of the glass surrounding the hold was pointing upwards as if the glass had literally exploded upward, not down into the car. I have never heard of anything like this happening, and luckily my wife was under control enough when it happened that she didn't swerve off the road. After the dealership submitted details of this incident to Ford, they rejected to do anything to take care of this repair for us. I have since had to file a claim with my insurance to get it fixed, and have been contacting

ANDERSON, ET AL. V. FORD - 12

Ford executives on a daily basis, and contacting media sources, to get attention to this safety issue. I have found several other cases that stretch back to as far back as 2008 so far, with a description almost identical to ours. This is a safety issue that needs to have attention brought to before somebody gets seriously hurt or dies. *TR

(NHTSA ID: 10606988 – Date Complaint Filed 06/30/2014)

2016 Ford Explorer. The rear sunroof exploded, I was driving down Tollway 99 out side of Houston Texas, at about 60 mph. The roadway is flat and straight the 4+ lanes are 150 yards apart, no overpasses. There were no other cars or trucks within 100 yards or more. And a very loud noise, like a gun shot "blew out" the rear glass (the front does not move, the rear cannot) in the sunroof. I only have about 8000 mile on the SUV. Ford does not seem to understand the problem and keeps saying it must have been a rock. I can't prove they are wrong and they can't prove that I am correct. So my insurance pays, which means we all lose.

(NHTSA ID: 10870814 – Date Complaint Filed 05/25/2016)

2013 Ford F-150. In April 2014 our sunroof exploded as we were driving on the highway. We took it to the Ford dealership where we purchased the truck and they said they had never heard of a sunroof exploding for no reason. After further research it looks like this has happened to other people. Ford took no responsibility and charged us $1035.05 to replace the sunroof. Scared us to death when the sunroof exploded. Thankfully no one was hurt.

(NHTSA ID: 10818459 – Date Complaint Filed 01/06/2016)

2014 Ford Escape. My wife and I were driving on a 4 lane highway during the day. We were not operating the panoramic sunroof and the shade was completely open. Suddenly and all at once, the front pane of glass in the sunroof exploded into the cabin. Glass cut my face in two locations and caused bleeding. There was no nearby traffic in front of us or on the side. We were not traveling under an overpass. We were able to quickly regain control of the vehicle as the breakage caused us to slow down and swerve. There were no other collisions or damage after the sunroof broke. As no object or projectile caused the breakage and there was no prior damage to the sunroof, it is obvious that there was fault with either the glass or sunroof assembly.

(NHTSA ID: 10671793 – Date Complaint Filed 01/12/2015)

ANDERSON, ET AL. V. FORD - 13

2009 Lincoln MKZ. No extraneous variables leading to the rear window explosion. The police were not able to find any contact entry or evidence of vandalism and indicated it was possibly defective glass. Dealership indicated that they would not investigate the possibility of previous stress cracks or design defects, although they admitted that this class of vehicle has severe internal pressure fluctuations while a rear passenger window is open traveling at highway speeds, and this was experienced the day before. The glass shattered while the car was parked, with the temperature being between 65 & 70F, with nobody in it. There were no prior issues with the glass. The only issue with the vehicle prior to the glass was the pressure fluctuations.

(NHTSA ID: 10401537 – Date Complaint Filed 05/18/2011)

2010 Lincoln MKS. While driving the moon-roof exploded from the inside of the vehicle out. The noise was very loud, shot gun type noise, tire blow out, etc.

(NHTSA ID: 10761909 – Date Complaint Filed 09/03/2015)

2013 Lincoln MKT. The panoramic roofs on the Lincoln MKT blow out for no reason. We have 14 MKTs in our fleet we have had close to 10 of the glass roofs shatter. We are very concerned that glass could into a drivers eyes as well as our passengers. Also when they do blow out a good size chunk of the roof blows out and anyone behind us could be in grave danger especially someone on a motorcycle. The design of these roofs is flawed and either these roofs should not be allowed or they should be design with a type of glass or plastic product that won't shatter. Lincoln helped us in some of the incidences with the cost are now telling us a definitive no! Cost to replace a glass roof runs about $1500.

(NHTSA ID: 10759218 – Date Complaint Filed 10/07/2015)

2015 Lincoln MKT. We are a limousine service while driving down the highway, the glass roof exploded for no reason, no other vehicle were around.

(NHTSA ID: 10824752 – Date Complaint Filed 02/08/2016)

**C. Ford's Knowledge of the Defect**

34. A survey of driver complaints shows that Ford sunroofs often shatter within weeks or months of purchase, and NHTSA was informed of this problem in Ford vehicles as early as 2008. *See* Exhibit 1.

35.     Like other automobile manufacturers, Ford monitors NHTSA for information on emerging problems with its vehicles.

36.     In 2011, a Wards Auto piece noted that the popularity and demand for Ford's panoramic Vista sunroofs was increasing and exceeding Ford's expectations. The article discussed Ford's plans to offer the option on more vehicles. *See* Bryan Pope, *Panoramic Popularity Catches Ford Off-Guard,* Wall St. J. (August 11, 2011), http://wardsauto.com/ news-analysis/panoramic-popularity-catches-ford-guard (accessed on June 15, 2017).

37.     In 2012, The Wall Street Journal reported on the popularity of panoramic sunroofs among the many vehicle manufacturers who offered it and noted safety concerns over rollover strength and reports of glass spontaneously shattering. *See* Neil Parmar, *Supersizing the Sunroof, Even in Economy Cars,* Wall St. J. (December 11, 2012), http://www.wsj.com/ articles/SB10001424127887324024004578173271481039256 (accessed on June 15, 2017).

38.     On or before May 14, 2014, NHTSA opened an investigation of the panoramic sunroof failures, which initially focused on 2011-2013 Kia Sorento panoramic sunroofs. *See* Nat'l Highway Traffic and Safety Admin., U.S. Dep't of Transp., Office of Defects Investigation: No. EA 14-002 (Opened: 05/12/2014), https://www-odi.nhtsa.dot.gov/owners/ SearchResults;jsessionid=1TZpY0HQcwJvFCWzP6l6GkpnLFsLJbB0Qv4TY1TTLLjYyCX3 WbP1052099763 (accessed on June 15, 2017). The investigation was soon expanded to other vehicle manufacturers, including Ford.

39.     On July 25, 2014, NHTSA sent a letter to Ford requesting information about its vehicles with panoramic sunroofs, including the model years 2011-2014 Ford Explorer, Edge, and Escape vehicles (referred to in the NHSTA investigation as "Peer Vehicles"). The information requests from NHTSA included, among other items: Ford's sales numbers for Peer Vehicles, identification of the model and supplier of the panoramic sunroofs for the Peer Vehicles, and identification of all complaints received by Ford regarding shattering sunroofs in the Peer Vehicles. *See* Exhibit 2 (Letter from Scott Yon, Office of Defects Investigation Chief,

to Steven Kenner, Global Director of the Ford Motor Company Automotive Safety Office (July 25, 2014), also available at http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM516188/INIM-EA14002-63587.pdf (accessed on June 15, 2017)).

40.    According to Ford's NHTSA responses (dated August 22, 2014 and amended on September 2, 2014), approximately 563,000 Peer Vehicles were sold in the United States and U.S. protectorates and territories, as shown in the chart below (note: as Ford explained in its response, the Ford Escape had no panoramic sunroof option until model year 2013):

| Model | 2011 MY | 2012 MY | 2013 MY | 2014 MY |
|---|---|---|---|---|
| *Ford Explorer* | 34,833 | 31,826 | 80,063 | 73,353 |
| *Ford Edge* | 58,635 | 31,534 | 83,502 | 15,052 |
| *Ford Escape* | N/A | N/A | 91,910 | 62,241 |

(http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466295/INRL-EA14002-59971P.pdf and http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466296/INRL-EA14002-60016P.pdf, accessed on June 15, 2017).

41.    In those same responses, Ford identified suppliers of panoramic sunroofs in the Peer Vehicles as follows:

a.    The 2011-2014 Ford Explorer front and rear glass panel is supplied by Inalfa Roof Systems and is called Dual Panel Moonroof;

b.    The 2011-2014 Ford Edge front and rear glass panel is supplied by Webasto Roof Systems and is called Panoramic Vista Roof; and

c.    The 2013-2014 Ford Escape front and rear glass panel is supplied by Inalfa Roof Systems and is called Panoramic Vista Roof. (http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466295/INRL-EA14002-59971P.pdf and http://www-odi.nhtsa.

dot.gov/acms/cs/jaxrs/download/doc/UCM466296/INRL-EA14002-60016P.pdf, accessed on June 15, 2017).

42. In addition, Ford explained how it gathers complaints through its internal system:

a. Ford receives and documents reports from customers, dealerships, and Ford Motor Company in its FMC 360 system;

b. Ford's Common Quality Indicator System contains communications and reports from vehicle service and technical support activities and field operations;

c. Ford's Analytical Warranty System contains warranty claims received by Ford; and

d. Ford's Legal Claims/Lawsuits system contains those matters in litigation. (http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466295/INRL-EA14002-59971P.pdf and http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466296/INRL-EA14002-60016P.pdf, accessed on June 15, 2017).

43. In response to NHTSA's request, Ford compiled its own data for the Explorer, Edge, and Escape sunroof shattering complaints. These charts show the number of non-duplicative complaints that Ford submitted to NHTSA on September 2, 2014:

a. 2011-2014 Ford Explorer

| Category of Complaint Information | Number of Complaints |
|---|---|
| AWS | 1 |
| CQIS | 20 |
| FM360 | 9 |
| Legal Claims/Lawsuits | 1 |
| **TOTAL** | **31** |

*See* NHTSA Investigation No. EA-14002, 09/02/14 (Appendix C: Ford Explorer).

b.    2011-2014 Ford Edge

| CATEGORY OF COMPLAINT INFORMATION | NUMBER OF COMPLAINTS |
|---|---|
| AWS | 4 |
| CQIS | 44 |
| FM360 | 42 |
| Legal Claims/Lawsuits | 3 |
| **TOTAL** | **93** |

*See* NHTSA Investigation No. EA-14002, 09/02/14 (Appendix C: Ford Edge).

c.    2013-2014 Ford Escape

| CATEGORY OF COMPLAINT INFORMATION | NUMBER OF COMPLAINTS |
|---|---|
| AWS | 1 |
| CQIS | 16 |
| FM360 | 11 |
| Legal Claims/Lawsuits | 1 |
| **TOTAL** | **29** |

*See* NHTSA Investigation No: EA-14002, 09/02/14 (Appendix C: Ford Escape).

44.    Ford internally tracks information regarding panoramic sunroof failures through drivers, dealerships, complaints, warranty claims, replacement part data, dealings with insurance carriers, and other aggregated sources. Ford has nearly exclusive access to this information, including its pre-release testing of vehicle components, so it is implausible that Ford had no knowledge very early on about the defect. According to Ford's own data, the

actual number complaints about panoramic sunroof failure is more than *double* the number of complaints NHTSA documented for all models of Class Vehicles, and potentially even higher given that the data described above is for only a few, limited models and years of Class Vehicles.

45. On April 14, 2016, NHTSA made a second request for information, requesting Ford identify all Ford panoramic roofs and complaints of shattered roofs for model years 2006-2016. *See* Exhibit 3 (Nat'l Highway Traffic Safety Admin., *EA12-002: General Order Directed to Motor Vehicle Manufactures* (April 14, 2016), available at http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514031/INLM-EA14002-63477.pdf (accessed on June 15, 2017)).

46. The response from Ford was due on May 16, 2016, but has not yet been posted on the NHTSA website.

47. Upon information and belief, Ford is also aware that other manufacturers whose vehicles suffered from similar shattering problems have voluntarily initiated safety recalls to notify drivers of the danger and repair the sunroofs free of cost.

48. Ford conducted a panoramic sunroof recall—for its 2014 Ford Escape vehicles manufactured between October 15 - 22, 2013— where a urethane bond, not ceramic paint, was used to connect the panoramic sunroof to the bracket and was improperly bonded. *See* Letter from Steven Kenner, Ford Motor Company's Global Director of Automotive Safety Office, to Nancy Lewis, Associate Administrator for Enforcement at the NHTSA, regarding the "2014 Model Year Ford Escape Safety Recall #14S13—Panorama Roof Glass Assembly Bond" (June 30, 2014), available at https://static.nhtsa.gov/odi/rcl/2014/RCDNN-14V403-8342P.pdf?_ga=1.130406473.711047123.1487811501 (accessed on June 15, 2017.) The 2014 Escape recall affected 1,867 vehicles. While Ford issued a recall for the urethane bonding problem that affected approximately 2,000 vehicles, it has done nothing regarding the far more prevalent problem relating to the tempered glass shattering that affects potentially hundreds of thousands

of Ford vehicles. Meanwhile, Ford still publicly claims it has a commitment to quality and safety.

49.     In Ford's 2015-2016 Sustainability Report, Ford's Group Vice President of Quality, Bernie Fowler, states:



"Quality is a journey. This journey is about continuous improvement and, ultimately, transformation. As with any journey, you need to decide where you are going and how you are going to get there.

At Ford Motor Company, we have a clear destination for our quality journey: to deliver world-class quality in every region. We reach our destination by improving every day."

Bennie Fowler
Group Vice President of Quality, Ford



(http://corporate.ford.com/microsites/sustainability-report-2015-16/index.html, accessed on June 15, 2017).

50.     In that same sustainability report and in the same section as Quality VP Fowler's statement, Ford announces its commitment to safety:

**VEHICLE SAFETY**

Quality is critical to the safety of our customers and, therefore, to our responsibilities and success as a company. We are trusted to design and manufacture vehicles that achieve high levels of safety over a wide range of real-world conditions.

1  *See* http://corporate.ford.com/microsites/sustainability-report-2015-16/products-

2  safety.html#what (accessed on June 15, 2017).  See also the "safety pages" from the report

3  contained in Exhibit 4.

4       51.    Ford claims that its sunroofs shatter as a result of impact from roadway objects.

5  Rocks or other objects thrown up by cars and trucks on the roadway would not impact the

6  sunroof with sufficient force to cause it to shatter, let alone shatter the sunroof glass *outward*, a

7  fact Ford is aware of as it is described in many driver complaints. More significantly, some

8  Ford panoramic sunroofs have spontaneously shattered *while the vehicle was parked*. The

9  complaints are also viewable online at https://www-odi.nhtsa.dot.gov/owners/

10  SearchSafetyIssues.

> 2014 Ford Explorer. Was sitting in my new Ford Explorer Sport, when heard a loud pop like a gun. Got out and walked around car to see if something it me. . nothing Started to drive away at around 20 mph. started to hear road noise coming from sunroof. Started to retract shad wen noticed glass fragments falling, closed shad pulled over and took pictures. . contacted and have been told that something must have hit the sunroof?  Like what I said a meteor!!! They laughed and said I should contact my insurance co. but that's fraud I said?  Again, they laughed. . come on Ford stand behind your craftsmanship or get another owner wh2o will?  Very disappointed?  So what to do now?*TR
>
> (NHTSA ID:  10595844 – Date Complaint Filed 06/04/2014)
>
> 2013 Ford Explorer. My panoramic sunroof exploded!! I was sitting in my vehicle, parked in the driveway and heard a loud noise. I got out and checked the tires and around my vehicle. I saw nothing unusual so I got back in, turned the air off and that's when I discovered it was the sunroof. I heard crackling of glass. Got back out and stepped in the back passenger door and looked on top – it had cracked in the shape of an x with a small pop up right in the center. It was obvious that nothing had hit the glass because I was parked in my driveway and the glass was pushed upward instead of inward. I took numerous pictures of the vehicle sitting in my driveway right after this happened. Drove it to the nearest dealership, within a half hour, as per the service mgr. for pre approval of warranty coverage. It was denied twice. Ford's response for denial of warranty coverage: "As per Section 3 of the

warranty and policy manual, damaged glass (stone chips, scratches, etc.) is not considered a warrantable condition unless as related to another defective component. The loud noise as described by the customer has generally been found to be the time in which the glass is impacted in other similar cases. The point of impact to the glass is the place in which the glass is broken and bowed upward (bow upward due to interior cabin pressure is slightly greater than ambient pressure when windows are up and the HVAC system is running.) Unfortunately, this broken glass is considered to be damage that can not be covered under the new vehicle warranty at this time." 23 days later. . . my $40k vehicle is still damages and sitting in my garage b/c this is an ongoing issue with panoramic sunroofs exploding. Ford can not keep up with the demand for replacement glass. I pray someone, especially a child is not injured or even worse killed by this defect. *TR

(NHTSA ID: 10520728 – Date Complaint Filed 06/19/2013)

2013 Ford F-150. I went out to my truck and started it up. I noticed there were tiny shiny specks on the center console. I look up and my sunroof was totally shattered. When I parked the day before everything was fine. There were no trees that something cold have fallen from that might have this. NO other vehicles parked nearby were damaged and vandals usually go for side windows. It was not unusually cold. A short search on the internet shows that this problem is not as isolated as the Ford Dealer that the body shop I'm using called. There are others with Ford products that this has happened to. Some were driving when their sunroofs exploded others came out to find their sunroofs in the same condition as mine. *TR

(NHTSA ID: 10655345 – Date Complaint Filed 11/17/2014)

**D.      The Dangers Posed to Class Vehicle Occupants**

52.      NHTSA, KATRI, and responsible automobile manufacturers have acknowledged that the spontaneous failure of panoramic sunroofs endangers drivers, passengers, and others on the road. A panoramic sunroof is an expensive upgrade option that costs thousands of dollars to replace. A reasonable person considering whether to purchase or lease a Ford vehicle would want to be informed about the panoramic sunroof defect before deciding whether to spend the additional money.

53.     When panoramic sunroofs shatter, they make a sudden and extremely loud noise, followed by shards of glass raining down onto the driver and passengers. Drivers report that the falling shards of glass have injured them and their passengers and have caused damage to their vehicles. Drivers have also reported a number of near-miss accidents that occurred after they were startled or distracted because the sunroof shattered while the vehicle was in motion. Both Ford and NHTSA have received reports of injuries caused by sunroof failure. *See* Exhibit 1.

54.     Other manufacturers recognize the safety risk. When Volkswagen initiated a safety recall for shattering panoramic sunroofs, it acknowledged that drivers "could be injured by falling glass," and that "[i]f the glass panel were to break while the vehicle is in motion, it could cause the driver distraction, increasing the risk of a crash." *See* Press Release, Volkswagen of America, Inc., *Volkswagen Issues Voluntary Recall* (Dec. 7, 2014), http://media.vw.com/release/856/ (accessed on June 15, 2017).

55.     When Hyundai initiated is recall, it too acknowledged that the shattering of panoramic sunroofs "relates to motor vehicle safety," including by posing a risk of injury to vehicle occupants. In connection with the Hyundai recall, NHTSA wrote that the breaking of the panoramic sunroof could lead "to personal injury or a vehicle crash." *See* Letter from Robert Babcock, Hyundai America Technical Center, Inc. (HATCI)'s Director of Certification and Compliance Affairs, to Nancy Lewis, Associate Administrator for Enforcement at the NHTSA, regarding "Defect Information Report" (December 6, 2012), https://static.nhtsa.gov/odi/rcl/2012/RCDNN-12V568-7763.pdf?_ga=1.68163031.711047123.1487811501 (accessed on June 15, 2015).

56.     In connection with an Audi recall, NHTSA wrote that "should the sunroof's glass break while the vehicle is in use, the falling glass could cut and injure the driver or passengers [and] could also distract the driver, increasing the risk of a crash."

57. KATRI concluded that the sudden shattering of a panoramic sunroof while driving may cause "abrasions due to shattered glass" and also cause the "risk of secondary accidents."

58. In December of 2012, KATRI launched an investigation that culminated in November 2013 when it met with numerous car manufacturers in Seoul, South Korea, announcing its finding that the ceramic tint in panoramic sunroofs substantially weakened the glass and compromising its safety. KATRI recommended widespread recalls—a recommendation unheeded by Ford.

**E. Ford Refuses to Warn Drivers**

59. Despite the high number of complaints and the danger posed by the defect, Ford continues to conceal its existence from current and potential customers alike. Ford has not warned consumers at the point of sale/lease or when drivers who have experienced a shattered sunroof bring their vehicles in for repairs, making no effort to alert consumers of the risk. Ford knows of the defect yet continues to profit from the sale and lease of vehicles to unwitting customers.

60. Ford conceals the defect even though it knows it is not reasonably discoverable by consumers unless they experience a failure and are exposed to the attendant safety risks.

61. Ford remains silent even as it continues to receive complaints from concerned drivers and the NHTSA investigators, and blames impact from external objects even though Ford knows the problem is the defective sunroof.

62. As a result of Ford's inaction and silence, consumers are unaware that they purchased or leased a vehicle which has a defective sunroof, and continue to drive these unsafe vehicles. In addition, consumers who experienced a failure and brought their vehicles to a dealership for repairs are not told that identically defective sunroofs are installed as replacements in their vehicles.

63. Other manufacturers of vehicles with similar panoramic sunroof problems—such as Audi, Hyundai, and Volkswagen—voluntarily initiated safety recalls, notifying drivers of the danger and offering to repair the sunroofs free of cost.

**F. Ford's Deceptive Warranty Practices**

64. The relevant terms of the Ford and Mercury brand Class Vehicles' warranties are substantially the same: they are backed by a bumper-to-bumper warranty that lasts for three years or 36,000 miles, whichever comes first, and five-year/60,000 mile powertrain coverage.

65. The relevant terms of Ford's Lincoln brand Class Vehicles warranty are substantially the same: they are backed by bumper-to-bumper coverage that lasts for four years or 50,000 miles, whichever comes first, and six-year/70,000 mile powertrain coverage.

66. Plaintiffs and/or Class Members experienced damage from the Defect within the warranty periods of their vehicles. Plaintiffs and/or Class Members reasonably expected that any and all damage that resulted from the sunroof defect would be covered under the warranty, and that they would not be charged for such repairs.

67. Ford has systematically denied coverage with respect to the defective sunroofs. Plaintiffs and numerous Class Members have been forced to incur substantial repair bills and other related damages, including being forced to make claims under their automotive insurance policies and incurring substantial deductibles.

## V. PLAINTIFFS' EXPERIENCE

68. In January 2016, Plaintiff Michelle Anderson purchased a new 2016 Ford Escape, Titanium model/VIN: 1FMCU9J93GUB37550 from Friendly Ford in Springfield, Missouri for a purchase price of $31,500.00. Plaintiff's Titanium model included Ford's "Power Panoramic Vista Roof."

69. Prior to buying their Escape, Plaintiff did extensive research for a new car that would meet requirements for safety, reliability, space and budget. This research included:

- Researching safety and quality ratings on the internet, including

researching the Escape generally;

- Talking with a family member who was pleased with the Ford Escape; and

- Talking extensively with sales people at Friendly Ford about this particular car and customer satisfaction.

70.     The panoramic sunroof feature on the Escape Titanium was a huge selling point for Ms. Anderson.  At approximately 7:00 a.m. on February 7, 2017, Michelle Anderson was driving to work in the morning on I-44 East near Springfield, Missouri. Suddenly, Ms. Anderson heard an explosion which sounded like a shotgun being fired.  She was panicked, but cautiously pulled to the shoulder. Thereafter she saw the large crack and hole in the sunroof, and noticed shattered glass inside the vehicle.

71.     Below is a photograph of the shattered sunroof in Ms. Anderson's 2016 Escape Titanium.



72.     Ms. Anderson drove Friendly Ford in Springfield, Missouri to get the sunroof repaired.  The Friendly Ford dealership stated that even though Ms. Anderson was within the initial warranty, and purchased extended warranty, the sunroof was not covered by the warranty. It took Friendly Ford approximately one week to repair the sunroof, which cost Ms. Anderson $345.08.  Ms. Anderson also had to pay to have the vehicle cleaned to remove the glass shards from inside the vehicle.

73.     Ms. Anderson therefore paid twice for a panoramic sunroof feature that she now cannot enjoy. She fears opening the sunroof shade because the sunroof might shatter again.

74.     Had Ford disclosed the panoramic sunroof defect, Ms. Anderson would not have purchased the vehicle or they would have paid substantially less for it given this safety defect. In addition, she would not have suffered the economic damages that they sustained from the sunroof failure.  Ms. Anderson did not receive the benefit of the bargain. Ford failed to disclose the Defect and the attendant risks associated with the Defect at the point of sale or otherwise.

## VI.  CLASS ACTION ALLEGATIONS

75.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of all others similarly situated as members of the following proposed Nationwide and Missouri State classes (collectively, the "Classes"), on their federal and state claims as purchasers and lessees of "Class Vehicles." Class Vehicles include all models below that are equipped with substantially similar factory-installed panoramic sunroofs:

- 2007-present model year Ford Edge vehicles;

- 2009-present model year Ford Focus vehicles;

- 2010-present model year Ford Fusion vehicles;

- 2011-present model year Ford Explorer vehicles;

- 2009-present model year Ford Flex vehicles;

- 2011-present model year Ford F 150 vehicles;

- 2009-2014 model year Ford Mustang vehicles;

- 2008-present model year Ford Escape vehicles;

- 2014-present model year Transit Connect vehicles;

- 2013-present model year Ford C-Max vehicles;

- 2007-present model year Lincoln MKX vehicles;

- 2009-2015 model year Lincoln MKS vehicles;

- 2013-present model year Lincoln MKZ vehicles;

- 2010-present model year Lincoln MKT vehicles;

- 2010-2011 model year Mercury Milan vehicles; and

- 2010-2011 model year Mercury Montego vehicles.

<u>Nationwide Class:</u>

All persons and entities residing in the United States, including its territories, who purchased or leased a Class Vehicle.

<u>Missouri Class:</u>

All persons and entities residing in Missouri who purchased or leased a Class Vehicle in Missouri.

Excluded from the proposed classes are Ford; any affiliate, parent, or subsidiary of Ford; any entity in which Ford has a controlling interest; any officer, director, or employee of Ford; any successor or assign of Ford; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse; members of the judge's staff; and anyone who purchased the Class Vehicle for the purpose of resale.

76. Members of the proposed classes are readily ascertainable because the class definitions are based upon objective criteria.

77. <u>Numerosity</u>. Ford sold many thousands of Class Vehicles, including a substantial number in Missouri. Members of the proposed classes likely number in the thousands and are thus too numerous to practically join in a single action. Class Members may

1    be notified of the pendency of this action by mail, supplemented by public notice (if deemed

2    necessary or appropriate by the Court).

3        78.    <u>Commonality and Predominance</u>. Common questions of law and fact exist as to

4    all proposed members of the Classes and predominate over questions affecting only individual

5    class members. These common questions include:

6            a.    Whether the sunroofs in the Class Vehicles have a propensity to

7    spontaneously shatter;

8            b.    Whether Ford knew or should have known that its panoramic sunroofs

9    have a propensity to spontaneously shatter, and if so, when Ford discovered this;

10           c.    Whether the knowledge of this propensity to shatter would be important

11   to a reasonable person, because, among other things, it poses an unreasonable safety hazard;

12           d.    Whether Ford failed to disclose and concealed from potential customers

13   the existence of the sunroofs' propensity to spontaneously shatter;

14           e.    Whether Ford breached its warranty obligations;

15           f.    Whether the Court may enter an injunction requiring Ford to notify

16   owners and lessees about the panoramic sunroofs' propensity to spontaneously shatter;

17           g.    Whether the Court may enter an injunction requiring Ford to cease its

18   practice of replacing shattered panoramic sunroofs with identically defective replacement

19   sunroofs;

20           h.    Whether Ford engaged in unfair or deceptive acts or practices in

21   violation of MO. REV. STAT. § 407.010, as alleged herein; and

22           i.    Whether Ford's conduct, as alleged herein, entitles Plaintiffs and the

23   Classes they represent to damages or restitution under the laws of their respective states.

24       79.    <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the proposed classes.

25   Plaintiffs and the members of the proposed classes all purchased or leased Class Vehicles with

26   panoramic sunroofs that have a propensity to spontaneously shatter, giving rise to substantially

27

the same claims. As illustrated by class member complaints, some of which are excerpted above, each vehicle model included in the proposed class definitions has a panoramic sunroof with the same Defect.

80. <u>Adequacy</u>. Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent. Plaintiffs retained counsel who are competent and experienced in complex class action litigation, and will prosecute vigorously on Class Members' behalf.

81. <u>Superiority</u>. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Ford economically feasible. Even if Class Members themselves could afford individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the defective sunroofs, individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

82. In the alternative, the proposed classes may be certified because:

a.  the prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Ford;

b.  the prosecution of individual actions could result in adjudications that as a practical matter would be dispositive of the interests of non-party Class Members, or which would substantially impair their ability to protect their interests; and

1    c.    Ford acted or refused to act on grounds generally applicable to the

2    proposed classes, thereby making appropriate final and injunctive relief with respect to

3    members of the proposed classes as a whole.

4              **VII.  TOLLING OF THE STATUTES OF LIMITATIONS**

5         83.    <u>Discovery Rule</u>. Plaintiffs' and Class Members' claims accrued upon discovery

6    that the panoramic sunroofs installed in their Class Vehicles were prone to spontaneous failure.

7    While Ford knew, and concealed, the fact that the panoramic sunroofs installed in the Class

8    Vehicles have a defect that causes spontaneous failure, Plaintiffs and Class Members could not

9    and did not discover this fact through reasonable diligence.

10        84.    <u>Active Concealment Tolling</u>. Any statutes of limitations are tolled by Ford's

11   knowing and active concealment of the fact that the panoramic sunroofs installed in the Class

12   Vehicles suffered from the Defect. Ford had a duty to disclose this defect and its consequent

13   performance and safety problems to Plaintiff and Class Members because Ford had knowledge

14   of this defect and the defect was not known to nor easily discoverable by Plaintiff and Class

15   Members.  Despite its affirmative duty to disclose the nature and existence of this defect, Ford

16   kept Plaintiffs and Class Members ignorant of vital information essential to the pursuit of their

17   claim, without any fault or lack of diligence on the part of Plaintiffs. The details of Ford's

18   efforts to conceal its above-described unlawful conduct are in its possession, custody, and

19   control, to the exclusion of Plaintiffs and Class Members. Plaintiffs and Class Members could

20   not have reasonably discovered the fact that the panoramic sunroofs installed in their Class

21   Vehicles were defective.

22        85.    <u>Estoppel</u>. Ford was and is under a continuous duty to disclose to Plaintiffs and

23   Class Members the true character, quality, and nature of the panoramic sunroofs installed in the

24   Class Vehicles. At all relevant times, and continuing to this day, Ford knowingly, affirmatively,

25   and actively concealed the true character, quality, and nature of the panoramic sunroofs

26   installed in the Class Vehicles. The details of Ford's efforts to conceal its above-described

27

unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class Members. Plaintiffs reasonably relied upon Ford's active concealment. Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

86. <u>Equitable Tolling</u>. Ford took active steps to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and leased Class Vehicles with defective panoramic sunroofs. The details of Ford's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class Members. However, Ford's failure to disclose and active concealment of the defect amounts to bad faith and deception in and of itself. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Ford fraudulently concealed its above-described wrongful acts. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## VIII.  CLAIMS FOR RELIEF

### COUNT 1

### EXPRESS WARRANTY

**(On behalf of the Nationwide Class, and alternatively on behalf of the Missouri Class)**

87. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set forth herein.

88. Ford provides all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

89. The parts affected by the defect, including the panoramic sunroofs and the brackets and assemblies to which the sunroofs were attached, were manufactured and distributed by Ford in the Class Vehicles and are covered by the warranties Ford provides to all purchasers and lessors of Class Vehicles.

90.     Ford breached these warranties by selling and leasing Class Vehicles with the panoramic sunroof defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties with free repairs or replacements during the applicable warranty periods.

91.     Ford further breached these warranties by not correcting the defect.  Although Ford warranted that it would correct defects in materials and workmanship in the Class Vehicles, Ford instead replaced shattered sunroofs in the Class Vehicles with identical defective sunroofs and thus has not corrected the defect.  Ford has failed and refused to conform the panoramic sunroofs in the Class Vehicles to the express warranty.  Ford's conduct has voided any attempt to disclaim liability for its actions.

92.     Plaintiffs notified Ford of the breach within a reasonable time or were not required to do so, because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.  Ford knew of the defect and chose to conceal it and to fail to comply with its warranty obligations.  Further, the replacement sunroof used by Ford is also defective.

93.     Ford's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under these circumstances.  Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

94.     Ford's attempt to limit its express warranty in a manner that would result in replacing its defectively designed panoramic sunroofs with identical defective sunroofs causes the warranty to fail its essential purpose and renders the warranty null and void.

95.     The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiffs and Class Members.  Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford.  A gross disparity in bargaining power exists between Ford

1  and the Class Members, and Ford knew or should have known that the panoramic sunroofs in

2  the Class Vehicles were defective at the time of sale and would fail well before the end of their

3  useful lives.

4      96.    Plaintiffs and Class Members have complied with all obligations under the

5  warranty, or otherwise have been excused from performance of those obligations as a result of

6  Ford's conduct described herein.

7      97.    As a direct and proximate cause of Ford's breach, Plaintiffs and the other Class

8  Members bought or leased Class Vehicles they otherwise would not have, overpaid for their

9  vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a

10 diminution in value.  Plaintiffs and Class Members have also incurred and will continue to

11 incur costs for repair and replacement of defective panoramic sunroofs and damage resulting

12 from the spontaneous shattering of such sunroofs.

13     98.    Plaintiffs and Class Members are entitled to legal and equitable relief against

14 Ford, including damages, consequential damages, specific performance, attorney fees, costs of

15 suit, and such further relief as the Court may deem proper.

16                              **COUNT 2**

17              **FRAUDULENT CONCEALMENT/NONDISCLOSURE**

18 **(On behalf of the National Class, and alternatively on behalf of the Missouri Class)**

19     99.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

20     100.   Ford knew or should have known that the Class Vehicles were and are defective

21 in the materials and workmanship of their panoramic sunroofs which made and makes the

22 panoramic sunroofs prone to spontaneously shatter.

23     101.   Ford fraudulently concealed from and/or failed to disclose to Plaintiffs, Class

24 Members, and all others in the chain of distribution (i.e., concealments and omissions in Ford's

25 communications with suppliers, wholesalers, retailers, service centers, and others in the chain

26

27

of distribution that were ultimately passed on to Plaintiffs and the Class) the true nature of the Class Vehicles and, specifically, the Defect.

102.    Ford was and is under a duty to Plaintiffs and the Class to disclose these facts because:

a.      Ford is in a superior position to know the facts regarding the Defect in the Class Vehicles and that the Defect is/was latent and not easily discoverable by Plaintiffs and Class Members;

b.      Ford made partial disclosures about the quality of the Class Vehicles while not revealing the defective nature of their panoramic sunroofs;

c.      The Defect poses a safety hazard to Plaintiffs and Class Members; and

d.      Ford fraudulently or recklessly concealed the defective nature of the Class Vehicles from Plaintiffs and the Class.

103.    The facts not concealed and/or disclosed by Ford to Plaintiffs and the Class are material facts that a reasonable person would have considered important in deciding whether or not to purchase (or to pay the same price for) a motor vehicle.

104.    Ford intentionally, willfully, maliciously or recklessly concealed and/or failed to disclose the problems with the Class Vehicles for the purpose of inducing Plaintiff and the Class to purchase the Class Vehicles.

105.    Plaintiffs and Class Members did not know about the Defect and could not have known about the Defect when they purchased the Class Vehicles because of Ford's concealment of the Defect.

106.    Plaintiffs and the Class justifiably acted or relied upon—to their detriment—the concealed and/or non-disclosed facts as evidenced by their purchases of the Class Vehicles and/or replacement panoramic sunroofs.

107.    Had Plaintiffs and the Class known of the Defect, they would not have purchased (or would have paid substantially less for) their Class Vehicles.

108.    As a direct and proximate result of Ford's misconduct, Plaintiffs and Class Members have suffered actual damages in that they bought and own Class Vehicles that contain the Defect.  Plaintiffs and Class Members have either already experienced their panoramic sunroof spontaneously shattering or are substantially like to experience it and be required to incur costs to repair or replace the defective sunroof.  Further, Ford offers no replacement for the defective sunroofs other than the same defective sunroof and parts, thereby rendering any repair/replacement useless and continuing to diminish the value of the Class Vehicle.

109.    Plaintiffs and Class Members have suffered losses resulting from Ford's fraudulent or reckless non-disclosure.  Accordingly, Ford is liable for all damages proximately caused by its conduct in an amount to be proven at trial.

110.    Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and the representations that Ford made to them, in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future in an amount to be determined according to proof.

## COUNT 3

### VIOLATIONS OF THE MISSOURI CONSUMER PROTECTION ACT, MO. REV. STAT. § 407.010, ET SEQ., *ET SEQ.*

### (On behalf of the Missouri Class)

111.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set forth herein.

112.    Ford is a "person" within the meaning of MO. REV. STAT. § 407.010, and conducts "trade" and "commerce" within the meaning of MO. REV. STAT. § 407.010.

113.    The conduct described in this complaint constitutes unfair and deceptive acts or practices in violation of the Missouri Consumer Protection Act.

114.    Ford engaged in unfair and deceptive acts or practices by engaging in a pattern and practice of: (i) failing to disclose that its Class Vehicles, and the panoramic sunroofs in its

Class Vehicles, were not of a particular standard, quality, or grade; (ii) failing to disclose, at and after the time of purchase or lease and repair, any and all known material defects or material nonconformity of the Class Vehicles, including the panoramic sunroofs of the Class Vehicles; (iii) failing to disclose at the time of purchase or lease that the Class Vehicles, including the panoramic sunroofs of the Class Vehicles, were not in good working order, were defective, and were not fit for their intended purpose; (iv) failing to give adequate warnings and notices regarding the use, defects, and problems with the Class Vehicles' panoramic sunroofs to customers and consumers who purchased and leased Class Vehicles, even though Ford possessed prior knowledge of the inherent defects in the panoramic sunroofs; (v) failing to disclose, either through warnings or recall notices, and actively concealed the fact that the Class Vehicles' panoramic sunroofs were defective, even though Ford learned of the defects through consumer complaints as early as 2008, if not before; (vi) causing Plaintiffs and members of the class to expend sums of money at its dealerships to repair and/or replace the Class Vehicles' panoramic sunroofs, despite Ford's knowledge of the defect; and (vii) replacing the Class Vehicles' panoramic sunroofs with equally defective panoramic sunroofs.

115. Ford's systematic practice of failing to disclose defects in the Class Vehicles' panoramic sunroofs, failing to give adequate warnings regarding defects with the class Vehicles' panoramic sunroofs, and failing to repair the Class Vehicles' panoramic sunroofs are unfair because these acts or practices offend public policy as it has been established by statutes, regulations, the common law or otherwise, including, but not limited to, the public policy established by MO. REV. STAT. § 407.010.

116. Ford's systematic practice of failing to disclose defects in the Class Vehicles' panoramic sunroofs, failing to give adequate warnings regarding defects with the Class Vehicles' panoramic sunroofs, and failing to repair the Class Vehicles' panoramic sunroofs are unfair because these acts or practices: (1) cause substantial financial injury to Plaintiffs and

1　Class Members; (2) are not outweighed by any countervailing benefits to consumers or

2　competitors; and (3) are not reasonably avoidable by consumers.

3　117. Ford's unfair and deceptive conduct was likely to deceive consumers into

4　purchasing Class Vehicles with panoramic sunroofs, to pay a premium for the sunroofs, and to

5　pay to repair or replace the sunroofs.

6　118. As a direct and proximate result of Ford's unfair and deceptive acts and

7　practices, Plaintiffs and Class Members have been injured in that they have purchased Class

8　Vehicles with defective panoramic sunroofs, paid a premium for the defective sunroofs, and

9　paid to replace the defective sunroofs with similarly defective sunroofs. Plaintiffs and Class

10　Members would not have purchased the Class Vehicles or would have paid substantially less

11　had they known about the Defect.

12　119. Ford's unfair or deceptive acts or practices have occurred in its trade or business

13　and affect the public interest because they were and are capable of deceiving a substantial

14　portion of the public and expose them to safety hazards. Ford's conduct is ongoing and has a

15　substantial likelihood of being repeated. There is a likelihood Ford's conduct will injure other

16　members of the public.

17　120. Apart from the capacity of Ford's unfair and deceptive acts and practices to

18　injure other members of the public, such acts and practices also offend the public policy laid

19　out in MO. REV. STAT. § 407.811.

20　121. Pursuant to MO. REV. STAT. § 407.010, et seq., Plaintiffs and the Missouri

21　Class seek an order enjoining Ford's unfair and deceptive acts or practices, damages, treble

22　damages, attorneys' fees, and any other proper and just relief under the Missouri CPA.

23

24

25

26

27

# COUNT 4

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, MO. REV. STAT. 400.2-314.1

### (On behalf of the Missouri Class)

122. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set forth herein.

123. Ford is and was at all times a "merchant" with respect to motor vehicles under MO. REV. STAT. 400.2-314.1.

124. The Class Vehicles are and were at all relevant times "goods" within the meaning of MO. REV. STAT. 400.2-314.1.

125. Ford was and is in actual or constructive privity with Plaintiffs and Class Members.

a. Plaintiffs and Class members had and continue to have sufficient direct dealings with Ford and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. Ford's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, i.e., Plaintiffs and class members.

b. Privity is not required to assert this claim because Plaintiffs and class members are intended third-party beneficiaries of contracts between Ford and its dealers, franchisees, representatives, and agents.

c. By extending express written warranties to end-user purchasers and lessees, Ford brought itself into privity with Plaintiffs and class members.

126. At all relevant times, Missouri law imposed upon Ford a duty that the sunroofs installed in the Class Vehicles be fit for the ordinary purpose for which sunroofs are used and that they pass without objection in the trade.

127.     Ford has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

128.     Ford failed to inform Plaintiffs and Class Members of the defective condition of the panoramic sunroofs.  The failure to warn Plaintiffs and class members of this defective condition constitutes a further breach by Ford of the implied warranties of merchantability.

129.     Plaintiffs and Class Members used the sunroofs installed in the Class Vehicles in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

130.     Ford was provided notice of these issues by a number of means, including but not limited to, its internal tracking procedures including direct communications from consumers, NHTSA consumer complaints, NHTSA Investigation EA 14-002, information available on internet forums, trade magazine articles, and at least one complaint filed against it styled Case No:  2:16-CV-01154, *Douglas Krebsbach et al. v Ford Motor Company*, in the United States District Court for the Eastern District of California.  Ford failed and refused to offer an effective remedy despite this notice.

131.     Ford's conduct constitutes a breach of the implied warranty of merchantability. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Missouri Class have suffered economic damage, including the premiums they paid for Class Vehicles with panoramic sunroofs, losses attributable to the diminished value of their Class Vehicles, loss of use of their Class Vehicles, and money spent to repair and replace their defective sunroofs.

132.     Plaintiffs and Class Members are entitled to legal and equitable relief against Ford, including damages, consequential damages, specific performance, attorneys' fees, costs, and any further relief the Court may deem proper.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter a judgment awarding the following relief:

A.      An order certifying the proposed classes and appointing Plaintiffs and their counsel to represent the Classes;

B.      An order awarding Plaintiffs and Class Members their actual damages, punitive damages, and/or any other form of monetary relief provided by law;

C.      An order awarding Plaintiffs and Class Members restitution, disgorgement, or other equitable relief as the Court deems proper;

D.      An order requiring Ford to cease selling vehicles with the defective panoramic sunroofs and to adequately disclose and repair the defective panoramic sunroofs;

E.      An order awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as allowed under the law;

F.      An order awarding Plaintiffs and Class Members reasonable attorneys' fees and costs of suit, including expert witness fees; and

G.      An order awarding such other and further relief as this Court may deem just and proper.

## X. JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury all issues so triable under the law.

RESPECTFULLY SUBMITTED AND DATED this 7th day of August, 2017.

By: /s/ Sarah S. Burns
       Sarah S. Burns #56554
       SIMMONS HANLY CONROY LLC
       One Court Street
       Alton, IL 62002
       Tel. 618-259-2222
       Fax: 618-259-2251
       mbreit@simmonsfirm.com

       Gregory F. Coleman
       GREG COLEMAN LAW PC
       First Tennessee Plaza
       800 S. Gay Street, Suite 1100
       Knoxville, Tennessee 37929
       Telephone: (865) 247-0080
       Facsimile: (865) 522-0049
       greg@gregcolemanlaw.com

       Jasper D. Ward IV
       Ashton Rose Smith
       JONES WARD PLC
       The Pointe
       1205 E. Washington St., Suite 111
       Louisville, Kentucky 40206
       Tel. (502) 882-6000
       Fax (502) 587-2007
       jasper@jonesward.com
       ashton@jonesward.com

       *Attorneys for Plaintiffs*